**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
:
CAROLINE SIMON, Individually and on :
Behalf of All Others Similarly Situated, :
:
:
Plaintiff, :
:
v. :  Case No. 1:19-cv-00890-CM
:
ULTIMATE FITNESS GROUP, LLC d/b/a :
ORANGETHEORY FITNESS, and DOES 1 :
through 10, Inclusive, and Each of Them, :
:
Defendants. :
:
———————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ULTIMATE FITNESS GROUP, LLC d/b/a ORANGETHEORY FITNESS'S MOTION TO STAY

DLA PIPER LLP (US)
550 South Hope Street
Suite 2400
Los Angeles, California 90071
(213) 330-7700

1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

*Attorneys for Defendant*
*Ultimate Fitness Group, LLC d/b/a*
*Orangetheory Fitness*

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................5

   A.   Plaintiff's Claim Turns on Whether an Autodialer Was Used. ......................5

   B.   The Evolution of the Definition of An Autodialer Under the TCPA. ...........6

   C.   *ACA International* and the FCC's Request for Public Comment..................9

   D.   Post-*ACA International* Decisions Have Inconsistently Interpreted
        the Definition of An Autodialer. ..................................................................12

III.   AUTHORITY AND ARGUMENT ................................................................16

   A.   The Court Has the Inherent Power to Issue a Stay. ....................................16

   B.   A Stay is Warranted Under the Primary Jurisdiction Doctrine ...................17

      1.   The Determination of What Types of Systems Constitute Autodialers
           Requires the FCC's Expertise. ..............................................................18

      2.   The Relevant Issues the FCC's Request for Comment Raises Were
           Placed Squarely within the FCC's Jurisdiction to Administer and
           Interpret the TCPA..................................................................................19

      3.   There is a Substantial Danger of Inconsistent Rulings if a Stay is Not Issued. ........20

      4.   A Prior Application Has Been Made to the FCC. ...................................21

   C.   Courts Have Rejected All of the Reasons Plaintiff Might Raise in
        Objection to a Stay....................................................................................22

IV.    CONCLUSION ................................................................................................24

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*ACA International v. Fed. Commc'ns Comm'n*,
885 F.3d 687 (D.C. Cir. 2018) ...................................................................... *passim*

*Buhr v. ADT LLC*,
No. 18-cv-80605, Dkt. No. 40 (S.D. Fla. July 25, 2018) ...................................... 2

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016) ......................................................................................... 6

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
883 F.3d 459 (4th Cir. 2018) ............................................................................ 20

*CE Design, Ltd. v. Prism Bus. Media, Inc.*,
606 F.3d 443 (7th Cir.2010) ............................................................................. 20

*Charvat v. EchoStar Satellite, LLC*,
630 F.3d 459 (6th Cir. 2010) ............................................................................ 17

*Cline v. Ultimate Fitness Grp., LLC*,
No. 6:18-cv-771-Orl-37GJK, ECF No. 65 (M.D. Fla. February 12, 2019) ............. 3

*Conboy v. AT & T Corp.*,
84 F. Supp. 2d 492 (S.D.N.Y. 2000) .............................................................. 18, 19

*Dominguez v. Yahoo, Inc.*,
894 F.3d 116 (3d Cir. 2018) ........................................................................... 12, 13

*Duran v. La Boom Disco, Inc.*,
--- F. Supp. 3d ---, 2019 WL 959664 (E.D.N.Y. Feb. 25, 2019) ........................... 15

*Ellis v. Tribune Television Co.*,
443 F.3d 71 (2d Cir. 2006) ............................................................................ 17, 18

*Errington v. Time Warner Cable Inc.*,
No. 2:15-CV-02196 RSWL (DTB), 2016 WL 2930696 (C.D. Cal. May 18,
2016) ................................................................................................................ 21

*Ford Motor Credit Co. v. Chiorazzo*,
529 F. Supp. 2d 535 (D.N.J. 2008) .................................................................... 16

*Ford v. Bluestem Brands, Inc.*,
No. 18 CV 2695 (VB), 2019 WL 1046367 (S.D.N.Y. March 5, 2019) ................... 6

*Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*,
   84 F.3d 91 (2d Cir. 1996) .................................................................................................17

*Glasser v. Hilton Grand Vacations Co., LLC*,
   341 F. Supp. 3d 1305 (M.D. Fla. 2018) ...........................................................................15

*Gonzalez v. Ocwen Loan Servicing, LLC*,
   No. 5:18-CV-340-OC-30PRL, 2018 WL 4217065 (M.D. Fla. Sept. 5, 2018) ......................14

*Gusman v. Comcast Corp.*,
   No. 13CV1049-GPC DHB, 2014 WL 2115472 (S.D. Cal. May 21, 2014) ...........................21

*King v. Time Warner Cable, Inc.*,
   894 F.3d 473 (2d Cir. 2018) ............................................................................. 4, 12, 13, 14

*Limonium Mar., S.A. v. Mizushima Marinera, S.A.*,
   201 F.3d 431 (2d Cir. 1999) ..............................................................................................16

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
   676 F.3d 83 (2d Cir. 2012) ................................................................................................16

*Mais v. Gulf Coast Collection Bureau, Inc.*,
   768 F.3d 1110 (11th Cir. 2014)...........................................................................................20

*Marks v. Crunch San Diego, LLC*,
   904 F.3d 1041 (9th Cir. 2018) .............................................................................. 12, 13, 14

*Mejia v. Time Warner Cable Inc.*,
   Nos. 15-CV-6445 (JPO), 15-CV-6518 (JPO), 2017 WL 5513638 (S.D.N.Y.
   Nov. 17, 2017) ............................................................................................................2, 21

*Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*,
   46 F.3d 220 (2d Cir. 1995) ..........................................................................................17, 18

*Passero v. Diversified Consultants Inc.*,
   No. 13-CV-338C, 2014 WL 2257185 (W.D.N.Y. May 28, 2014) ......................... 2, 4, 20, 23

*Pinkus v. Sirius XM Radio, Inc.*,
   319 F. Supp. 3d 927 (N.D. Ill. 2018)..............................................................................3, 14

*Reyes v. BCA Fin. Servs., Inc.*,
   No. 16-24077-CIV, 2018 WL 2220417 (S.D. Fla. May 14, 2018)...................................4, 14

*Reynolds v. Time Warner Cable Inc.*,
   No. 16-CV-6165W, 2017 WL 362025 (W.D.N.Y. Jan. 25, 2017) ................................*passim*

*Rose v. Wells Fargo Advisors, LLC*,
   No. 16-CV-562-CAP, 2016 WL 3369283 (N.D. Ga. Jun. 14, 2016)....................................21

*Scoma Chiropractic, P.A. v. Dental Equities, LLC*,
No. 16-cv-41-FtM-99MRM, 2018 WL 2455301 (M.D. Fla. June 1, 2018)..........................22

*Secure v. Ultimate Fitness Grp., LLC*,
No. 18-20483-CIV-MORENO, Dkt. No. 64 (S.D. Fla. Mar. 18, 2019) .................................2

*Stewart v. T-Mobile USA, Inc.*,
No. 4:14-CV-02086-PMD, 2014 WL 12614418 (D.S.C. Oct. 8, 2014) ...............................18

*Wahl v. Stellar Recovery Inc.*,
No. 14-CV-6002-FPG, 2014 WL 4678043 (W.D.N.Y. Sep. 18, 2014)........................*passim*

**Statutes**

28 U.S.C. § 2342.........................................................................................................................20

47 U.S.C. § 151...........................................................................................................................19

47 U.S.C. § 227....................................................................................................................*passim*

47 U.S.C. § 402(a) ......................................................................................................................20

**Other Authorities**

FCC Public Notice, Consumer and Governmental Affairs Bureau Seeks Further
Comment on Interpretation of the Telephone Consumer Protection Act in
Light of the D.C. Circuit's *ACA International* Decision,
C.G. Docket Nos. 18-152, 02-278 (May 14, 2018).......................................................*passim*

FCC Public Notice, Consumer and Governmental Affairs Bureau Seeks Further
Comment on Interpretation of the Telephone Consumer Protection Act in
Light of the Ninth Circuit's *Marks v. Crunch San Diego, LLC* Decision,
Docket No. 02-278 (Oct. 3, 2018).........................................................................................12

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
7 FCC Rcd. 8752 (1992)...........................................................................................................7

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
10 FCC Rcd. 12391 (1995).......................................................................................................7

*In re Rules & Regulations Implementing the Telephone Consumer Prot. Act of
1991*,
18 FCC Rcd. 14014 (2003)...............................................................................................*passim*

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
23 FCC Rcd. 559 (2008)...........................................................................................................8

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
27 FCC Rcd. 15391 (2012).......................................................................................................8

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
　　30 FCC Rcd. 7961 (2015)...............................................................................*passim*

*Statement of Commissioner Brendan Carr on D.C. Circuit Decision in* ACA
　　International v. FCC, March 16, 2018,
　　https://docs.fcc.gov/public/attachments/DOC-349769A1.pdf..............................................24

Defendant Ultimate Fitness Group, LLC d/b/a Orangetheory Fitness ("Orangetheory"), respectfully submits this memorandum of law in support of its motion to stay this action pending rulings from the Federal Communications Commission ("FCC" or "Commission") regarding the definition of an automatic telephone dialing system under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA").[1]

## I.    INTRODUCTION

*"[W]hat constitutes an 'automatic telephone dialing system'?"*[2]  The FCC posted this question in its May 14, 2018 Request for Public Comment, which followed closely on the heels of the D.C. Circuit's decision in *ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018).  Although Orangetheory believes the text messages at issue in this action were not sent using an automatic telephone dialing system[3]—under *any* standard and that Plaintiff's Complaint should be dismissed for failure to allege use of an ATDS—the definition of an autodialer has been left in doubt since the D.C. Circuit's March 16, 2018 ruling in *ACA International*.  In its ruling, the D.C. Circuit vacated the FCC's prior rulings regarding the definition of an autodialer but failed to promulgate a new standard—causing courts to split over the scope and impact of its ruling and prompting the FCC to issue a Request for Public Comment, in which the FCC indicates that it will clarify the nature and constituent elements of an autodialer.

---

[1] Orangetheory has filed a Motion to Dismiss (ECF No. 31) the First Amended Class Action Complaint.  Should the Court grant that Motion to Dismiss, this Motion to Stay Proceedings will become moot.
[2] FCC Public Notice, "Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's ACA International Decision," CG Docket Nos. 18-152, 02-278 (May 14, 2018) ("FCC's Request for Comment").
[3] "Automatic Telephone Dialing System" is hereinafter referred to as "ATDS" or "autodialer." *See* FCC's Request for Comment, at 1 n.3 ("The Commission's rules also use the term 'autodialer,' which we have defined as synonymous with an automatic telephone dialing system.").

1

The FCC has the required expertise and authority to determine the scope and nature of an autodialer under the TCPA and was granted the authority by Congress to resolve in the first instance issues regarding implementation and enforcement of the TCPA.  A decision by the FCC providing guidance on the definition of an autodialer will have significant—potentially dispositive—impact on this case should it continue past the pleading stage.  The FCC on May 14, 2018, requested comments on several issues related to the interpretation and implementation of the TCPA with the comment period concluding on June 28, 2018.[4]  Accordingly, a stay is warranted under the primary jurisdiction doctrine until such time that the FCC issues a ruling.

Prior to *ACA International*, courts in this circuit stayed cases on the ground that the decision would alter the definition of an autodialer under the TCPA, thereby significantly affecting the course of litigation.  *See*, *e.g.*, *Mejia v. Time Warner Cable Inc.*, Nos. 15-CV-6445 (JPO), 15-CV-6518 (JPO), 2017 WL 5513638, at *5 (S.D.N.Y. Nov. 17, 2017); *Reynolds v. Time Warner Cable, Inc.*, No. 16-CV-6165W, 2017 WL 362025, at *3 (W.D.N.Y. Jan. 25, 2017).  The rationale for issuing stays in these cases continues post-*ACA International*, as the definition of an autodialer remains unsettled pending the FCC's ruling.  *See generally Passero v. Diversified Consultants, Inc.*, No. 13-CV-338C, 2014 WL 2257185 (W.D.N.Y. May 28, 2014) (staying TCPA action pending FCC ruling); *Wahl v. Stellar Recovery, Inc.*, No. 14-CV-6002-FPG, 2014 WL 4678043 (W.D.N.Y. Sep. 18, 2014) (same).  Additionally, courts in other jurisdictions have issued stays in putative TCPA class actions until the FCC issues its upcoming ruling, including in a case against Orangetheory.  *See*, *e.g.*, *Secure v. Ultimate Fitness Grp., LLC*, No. 18-20483-CIV-MORENO, ECF No. 64 (S.D. Fla. Mar. 18, 2019); *Buhr v. ADT Inc.*, No. 18-cv-80605,

---

[4] As discussed *infra*, the FCC briefly reopened the comment period until October 24, 2018.

ECF No. 40 (S.D. Fla. July 25, 2018).[5]  As explained below, the rationale for issuing a stay in these cases applies with equal, if not greater, force to this case for the following reasons:

<u>First</u>, the FCC is currently considering the precise questions at issue here: "[w]hat constitutes an 'automatic telephone dialing system' [under the TCPA]"?  "How 'automatic' must dialing be for equipment to qualify as an automatic telephone dialing system?  Must such a system dial numbers without human intervention?"  "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?"[6]  Orangetheory has filed a motion to dismiss on this issue, *see* ECF No. 31, which it believes should end this litigation; however, if this case moves beyond the pleading stage, whether an autodialer was used will continue to be a central, dispositive question and a class certification issue to the extent Plaintiff's proposed class received messages from multiple senders and/or different types of equipment.

<u>Second</u>, courts have already reached inconsistent determinations regarding the definition of an autodialer in the wake of the D.C. Circuit's ruling.  Some courts have held that the D.C. Circuit's ruling vacated all the FCC's prior orders regarding the definition of an autodialer, leaving only the statutory definition—*i.e.*, only systems that can themselves dial randomly or sequentially produced telephone numbers.[7]  Other courts have held that the FCC's 2003 Order

---

[5] On the other hand, the court in *Cline v. Ultimate Fitness Group, LLC*, No. 6:18-cv-771-Orl-37GJK, ECF No. 65 (M.D. Fla. February 12, 2019), denied a stay.  However, in that case the text message was sent using a handheld cell phone, placing the matter squarely within the ruling of *ACA*.

[6] *See* FCC's Request for Comment at 2-3.

[7] *See*, *e.g.*, *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 935 (N.D. Ill. 2018) ("*ACA International* necessarily invalidated the 2003 Order and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then to dial them.").

3

regarding predictive dialers remains in force.[8]   It is certain that courts will continue to reach disparate conclusions regarding the definition of an autodialer and the exact nature of human intervention required.[9]   If this case proceeds to judgment without the FCC's guidance, the Court may reach a determination that is inconsistent with the FCC's decision on the definition of an autodialer.  *See Passero*, 2014 WL 2257185, at *2 ("With regard to the danger of inconsistent rulings, the court need look no further than the split of case law authority on the threshold issue as to whether the protective provisions of the TCPA even apply to debt collection calls.").

   Third, considerations of prejudice and the potential costs of not awaiting agency review counsel in favor of a stay.  Plaintiff Caroline Simon seeks to certify a class potentially encompassing "all persons within the United States who received any unsolicited text messages from [Orangetheory] which text message was not made for emergency purposes or with the recipient's prior express consent within the four years prior to the filing of this Complaint" and to penalize Orangetheory up to $1,500 for each of the text messages sent during this period, creating the possibility for an astronomical aggregated statutory damages award.  *See* Compl. ¶¶ 17, 30, 36, ECF No. 11.   The underlying basis for such award, however, would be extinguished if the FCC issues a ruling clarifying that the equipment used is not an ATDS. Under these circumstances, courts routinely find that any prejudice to the non-moving party is outweighed by the potential harm to the moving party and the interests of avoiding inconsistent decisions.   Furthermore, Plaintiff will suffer no prejudice.   There is little risk that the harms

---

[8] *See*, *e.g.*, *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV, 2018 WL 2220417, at *9 (S.D. Fla. May 14, 2018) (holding that the D.C. Circuit left the FCC's 2003 Ruling regarding predictive dialers intact).
[9] *See King v. Time Warner Cable Inc.*, 894 F.3d 473, 482 (2d Cir. 2018) (noting *ACA* "declined to adopt" a human intervention standard and that "[g]iven those uncertainties, we venture no opinion on whether . . . lack of human involvement is a consideration relevant to King's claims").

4

Plaintiff alleges will recur because she claims she received messages in May and June of 2018 and makes no allegation that the messages have continued. The potential substantial harm to Orangetheory—which could later be invalidated—outweighs the negligible harm to Plaintiff in waiting to possibly recover statutory damages. *See Reynolds*, 2017 WL 362025, at *2 ("Although plaintiff surely has a genuine and recognized interest in pursuing statutory damages, he will not be significantly prejudiced by awaiting a decision in *ACA International* to do so.").

Ultimately, just as in the cases referenced above, a stay is appropriate here in order to avoid conflicting outcomes and a waste of judicial and litigant resources. Congress granted the FCC the authority to resolve issues regarding implementation and enforcement of the TCPA. A stay is therefore appropriate to enable the FCC to provide guidance on issues that are central to this case and which fall squarely within the FCC's primary jurisdiction.

## II.   BACKGROUND

### A.   Plaintiff's Claim Turns on Whether an Autodialer Was Used.

Plaintiff alleges that she received a text message from Orangetheory in May of 2018. Compl. ¶ 8.[10] Without supporting facts, Plaintiff alleges that "[t]his text message placed to Plaintiff's cellular telephone were [*sic*] placed via Defendant's SMS blasting platform, i.e., an 'automatic telephone dialing system.'" *Id.* at 9. Based on these meager allegations, Plaintiff alleges a claim for violation of the TCPA, 47 U.S.C. § 227, *see id.* ¶¶ 28-37, and seeks to represent a class of "[a]ll persons within the United States who received any unsolicited text messages from Defendant which text message was not made for emergency purposes or with the

---

[10] Plaintiff contends that after she received the text message in May, Orangetheory "began to use Plaintiff's cellular telephone for the purpose of sending Plaintiff spam advertisements and/or promotional offers . . . continu[ing] in or about June of 2018." Compl. ¶ 9. Plaintiff does not, however, include any specific allegations relating to any text messages she allegedly received from Orangetheory other than the May 2018 text message.

recipient's prior express consent within the four years prior to the filing of this Complaint." *Id.* at ¶ 17.

To maintain her claim, Plaintiff must establish that the device used to send the at-issue text message constitutes an ATDS. The TCPA makes it unlawful for a person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A). Therefore, "to state a claim under the TCPA, [Plaintiff] must allege that (1) a call was placed to a cell or wireless phone; (2) by the use of any automatic dialing system [and/or leaving an artificial or prerecorded message] and (3) without prior consent of the recipient." *Ford v. Bluestem Brands, Inc.*, No. 18 CV 2695 (VB), 2019 WL 1046367, at *3 (S.D.N.Y. March 5, 2019) (quoting *Jennings v. Cont'l Serv. Grp., Inc.*, 239 F. Supp. 3d 662, 665 (W.D.N.Y. 2017)). Text messages are treated as calls under the TCPA. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016).

Accordingly, in this case, a central dispositive question will be whether an autodialer was used—a question over which the parties will surely disagree and which will require this Court to determine the precise contours of what constitutes an autodialer. Further, to the extent Plaintiff's proposed class contains individuals who received messages from some other combination of equipment and software, the contours of the applicable autodialer standard will pose significant class certification and aggregate proof issues.

**B.    The Evolution of the Definition of an Autodialer Under the TCPA.**

The TCPA was enacted in 1991, and by its text defined an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or

sequential number generator[,] and . . . to dial such numbers." 47 U.S.C. § 227(a)(1). The TCPA also mandates that the FCC prescribe regulations to implement the requirements of the TCPA, which it has done through a "series of rulemakings and declaratory rulings addressing the Act's reach." *ACA Int'l*, 885 F. 3d at 693.

Following the TCPA's enactment, the FCC affirmed that an ATDS must generate numbers in a random or sequential fashion. In 1992, the FCC issued an order stating that the TCPA's prohibitions against using an ATDS "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8776 (1992). And, in a follow-on 1995 ruling, the FCC described "calls dialed to numbers generated randomly or in sequence" as "autodialed." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400 (1995).

In 2003, the FCC issued an order finding, among other things, "that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14093 (2003) ("2003 FCC Order"). The 2003 FCC Order defined a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." *Id.* at 14022 n.31. The FCC determined that predictive dialers fall within the definition of an ATDS, even though they may not "store or produce telephone numbers to be called, using a random or sequential number generator," as set forth in the text of the TCPA. *Id.* at 14091. The FCC

concluded that the defining characteristic of an ATDS is "the *capacity* to dial numbers without human intervention." *Id.* at 14092.  Though a predictive dialer might not fit squarely within the TCPA's statutory definition of an ATDS, the FCC found that it is the sort of *automated* equipment Congress intended to address through the TCPA because it has the "*capacity* to dial numbers without human intervention." *Id.* at 14092-93.

In 2008, the FCC issued a declaratory judgment that "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008).  In 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them *without human intervention* regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15392 n.5 (2012) (emphasis added).

Finally, in 2015, the FCC issued another declaratory ruling dealing with the definition of an autodialer.  *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 Order").  In its 2015 Order, the FCC took an expansive view of the definition of an autodialer, stating that the "capacity" to dial numbers randomly or sequentially "includes . . . potential functionalities," not just its "present ability." *Id.* at 7974-76.  Despite promulgating this broad definition, the FCC reaffirmed that "the basic functions of an autodialer is to dial numbers *without human intervention*." *Id.* 7975 (internal quotations omitted) (emphasis added).

8

C.    *ACA International* and the FCC's Request for Public Comment

On March 16, 2018, the D.C. Circuit struck down portions of the 2015 Order, and Orangetheory contends (as several courts have concluded) vacated the FCC's 2003 and 2008 rulings regarding the definition of an autodialer, holding that the FCC's Order "falls short of reasoned decisionmaking in 'offer[ing] no meaningful guidance' to affected parties" because it chose differing, contrary interpretations or no interpretations at all as to ATDS functionality. *ACA*, 885 F.3d at 701.  Specifically, the D.C. Circuit held that:

- Regarding the question of "what it means for equipment to have the 'capacity' to perform the autodialer functions enumerated in the statute," the D.C. Circuit noted that "the Commission adopted an expansive interpretation of 'capacity' having the apparent effect of embracing any and all smartphones." *Id.* at 695-96.  This expansive definition, according to the D.C. Circuit, swept too far: "The more straightforward understanding of the Commission's ruling is that all smartphones qualify as autodialers because they have the inherent 'capacity' to gain ATDS functionality by downloading an app.  That interpretation of the statute, for all the reasons explained, is an unreasonably, and impermissibly, expansive one." *Id.* at 700.

- On the question of whether the 2003 and 2008 Orders' expansion of the ATDS definition to include predictive dialers remained valid, the D.C. Circuit said it did not.[11]  Specifically, regarding "whether a device must itself have the ability to

---

[11] Indeed, the D.C. Circuit explicitly rejected the FCC's objection that the Court lacked jurisdiction to hear a challenge concerning the functions an ATDS must be able to perform because "the issue was resolved in prior agency orders—specifically, declaratory rulings in 2003 and 2008." *Id.* at 701.  The D.C. Circuit emphasized that "[w]hile the Commission's latest ruling purports to reaffirm the prior orders, **that does not shield the agency's pertinent**

generate random or sequential telephone numbers to be dialed" or can simply "call from a database of telephone numbers generated elsewhere," the D.C. Circuit said the FCC was "of two minds on the issue." *Id.* at 701. Rather than allow for the latter possibility, the D.C. Circuit stated that the FCC "fail[ed] to satisfy the requirement of reasoned decisionmaking" and held that "[w]e must therefore set aside the Commission's treatment of those matters." *Id.* at 703.

- Regarding the question of human intervention, the D.C. Circuit noted that although the FCC had consistently stated "that the 'basic function' of an autodialer is the ability to 'dial numbers without human intervention,'" it "nevertheless declined a request to 'clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention.'" *Id.* at 703 (quoting 30 FCC Rcd. at 7973, 7975-76). The D.C. Circuit concluded that "[t]hose side-by-side propositions are difficult to square"—*i.e.*, that a device may be an autodialer even if it dials numbers with human intervention even though the "'basic function' of an autodialer is to dial numbers without human intervention." *Id.* at 703.

- Finally, the D.C. Circuit noted that "the Commission further said that another 'basic function[ ]' of an ATDS is to 'dial thousands of numbers in a short period of time.' But the ruling imparts no additional guidance concerning whether that is a necessary condition, a sufficient condition, a relevant condition even if neither necessary nor sufficient, or something else. Nor does it indicate what would qualify as a 'short period of time.' Again, affected parties are left in a significant

---

**pronouncements from review**." *Id.* (emphasis added). As such, the D.C. Circuit "set aside the Commission's treatment of those matters." *Id.* at 703.

fog of uncertainty about how to determine if a device is an ATDS so as to bring into play the restrictions on unconsented calls." *Id.* (internal citation omitted).

Given the D.C. Circuit's decision, the FCC must now decide if anything beyond a system that randomly or sequentially generates numbers and then dials them can constitute an ATDS. If the FCC answers that question in the affirmative, it must clarify, *inter alia*, what human intervention is required, and what dialing thousands of numbers at a time really means. Summarizing its decision, the D.C. Circuit succinctly concluded that:

> [T]he Commission's ruling, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking. The order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the "capacity" to perform the necessary functions. We must therefore set aside the Commission's treatment of those matters.

*Id.* Just two months after the D.C. Circuit's ruling, the FCC issued its Request For Comment regarding the interpretation and implementation of the TCPA with initial comments due on June 13, 2018 and reply comments due June 28, 2018. In its Request, the FCC posed the following pertinent questions:

> We seek further comment on the functions a device must be able to perform to qualify as an automatic telephone dialing system. Again, the TCPA defines an "*automatic* telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, *using a random or sequential number generator*; and (B) to dial *such numbers*." Regarding the term "automatic," the Commission explained that the "basic function[]" of an automatic telephone dialing system is to "dial numbers without human intervention" and yet "declined to 'clarify[] that a dialer is not an [automatic telephone dialing system] unless it has the capacity to dial numbers without human intervention.'" As the court put it, "[t]hose side-by-side propositions are difficult to square." The court further noted the Commission said another basic function was to "dial thousands of numbers in a short period of time," which left parties "in a significant fog of uncertainty" on how to apply that notation. How "automatic" must dialing be for equipment to qualify as an automatic telephone dialing system? Does the word "automatic" "envision non-manual dialing of telephone numbers?" Must such a system dial numbers without human

> intervention?  Must it dial thousands of numbers in a short period of time?  If so,
> what constitutes a short period of time for these purposes?

Request for Comment at 2-3 (internal citations omitted) (emphasis in original).

On October 3, 2018, the FCC issued a public notice seeking further comment on the ATDS definition in light of the Ninth Circuit's decision in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) discussed *infra*.  *See* Consumer and Governmental Affairs Bureau Seeks Further Comment on Interpretation of the Telephone Consumer Protection Act in Light of the Ninth Circuit's *Marks v. Crunch San Diego, LLC* Decision, Docket No. 02-278 (Oct. 3, 2018).  The FCC set a comment deadline of October 17, 2018 and a reply comment deadline of October 24, 2018. *See id*

The questions posed by the FCC, and how the FCC ultimately answers them, will likely be dispositive of the merits questions before the Court in this case.

### D.   Post-*ACA International* Decisions Have Inconsistently Interpreted the Definition of An Autodialer.

In just the few months following the D.C. Circuit's ruling in *ACA International*, courts have split over the import of the decision, the status and continuing viability of the FCC's prior Orders, and the definition of an autodialer.

The Second, Third, and Ninth Circuits have issued opinions on the ATDS definition since *ACA International* and have taken diverging views.  Both the Second and Third Circuits agreed with the D.C. Circuit's holding that the ATDS definition cannot include a system's potential capacities.  *See King*, 894 F.3d at 477 ("Although we are not bound by the D.C. Circuit's interpretation of the statute, we are persuaded by its demonstration that interpreting 'capacity' to include a device's 'potential functionalities' after some modifications extends the statute too far."); *Dominguez v. Yahoo*, *Inc.*, 894 F.3d 116, 119 (3d Cir. 2018) ("In light of the D.C.

Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling.  Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer.").  Additionally, the Third Circuit expressly stated that random or sequential number generation is required to fit within the statutory ATDS definition and the Second Circuit appeared to accept that approach. *See id.* at 121 (stating "key factual question" is "whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers"); *see generally King*, 894 F.3d 473.  Despite these holdings, neither court reached the questions of whether the FCC's prior orders regarding predictive dialers, *see supra* Section II.B, remain good law[12] or how the human intervention standard has been affected.  *See generally King*, 894 F.3d 473; *Dominguez*, 894 F.3d 116.  Indeed, the Second Circuit in *King* expressly highlighted the open questions that remain in the wake of *ACA International* decision.  In response to "Time Warner['s] argu[ment] that the district court improperly relied on a 'human involvement' standard that is not reflected in the statute," the court noted that the FCC declined to adopt a standard in its 2015 Order and stated "we venture no opinion on whether that lack of human involvement is a consideration relevant to King's claims."  *King*, 894 F.3d at 481-82.

The Ninth Circuit in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) took a different approach.  In *Marks*, the Ninth Circuit held that *ACA International* vacated the prior FCC orders regarding the ATDS definition and, based on the statutory text alone—which it

---

[12] Although the Second and Third Circuits did not reach this question, the D.C. Circuit plainly rejected the expansion of the ATDS definition to include predictive dialers.  *See supra* Section II.C.  Regardless, the predictive dialer standard is irrelevant to the current dispute.  A predictive dialer is designed for voice communications, and assists telemarketers in predicting when a sales agent will be available to take calls.  A predictive dialer does not send text messages and would serve no function in text messaging because sales agents do not speak with the person being texted.  Plaintiff's alleged receipt of text messages thus has nothing to do with receiving calls through a predictive dialer.

found "not susceptible to a straightforward interpretation"—found that "equipment that ma[kes] automatic calls from lists of recipients [is] also covered by the TCPA." *Marks*, 904 F.3d at 1051. The Ninth Circuit thus departed from the Third Circuit's holding that random or sequential number generation is required for a device to be considered an ATDS and, in fact, read the words random or sequential number generator out of the statute. The Ninth Circuit, differing from the Second Circuit in *King*, also offered its opinion on the human intervention issue, stating that "[w]e also reject Crunch's argument that a device cannot qualify as an ATDS unless it is fully automatic, meaning that it must operate without any human intervention whatsoever" and that the at-issue system "dials numbers automatically, and therefore it has the automatic dialing function necessary to qualify as an ATDS." *Id.* at 1052-53.

Accordingly, in the wake of *ACA International*, the circuit courts through differing opinions have not resolved the open questions regarding the autodialer definition.

Unsurprisingly given this lack of clarity, district courts are also split on the impact of *ACA International*. Several district courts have held that the prior FCC Orders are all vacated by *ACA International*. In *Pinkus*, 319 F. Supp. 3d at 935, the Northern District of Illinois held that "*ACA International* necessarily invalidated the 2003 Order and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then to dial them." *See also Gonzalez v. Ocwen Loan Servicing, LLC*, No. 5:18-CV-340-OC-30PRL, 2018 WL 4217065, at *5-6 (M.D. Fla. Sept. 5, 2018) (holding *ACA International* overturned 2003 and 2008 FCC orders).

By contrast, in *Reyes v. BCA Financial Services., Inc.*, No. 16-24077-CIV, 2018 WL 2220417, at *1 (S.D. Fla. May 14, 2018), a court in the Southern District of Florida erroneously

held that the FCC's 2003 and 2008 predictive dialer rulings were *not* vacated by *ACA International* and remain binding law, even if the 2015 Order was set aside as inconsistent with those earlier rulings. *Id.* In *Duran v. La Boom Disco, Inc.*, --- F. Supp. 3d ---, 2019 WL 959664, at *10 (E.D.N.Y. Feb. 25, 2019), a court in the Eastern District of New York concluded that the "invalidation of the 2015 Order does not implicitly invalidate the prior FCC Orders."

Courts are also split on the issue of human intervention. Seemingly in contrast to the Ninth Circuit's narrow application of the human intervention standard in *Marks*, some district courts have found that human intervention disqualifies equipment as an autodialer. *See, e.g.*, *id.*, at *11 (granting summary judgment "because a user determines the time at which the ExpressText and EZ Texting programs send messages to recipients, [so] they operate with too much human involvement to meet the definition of an autodialer."); *Glasser v. Hilton Grand Vacations Co., LLC*, 341 F. Supp. 3d 1305, 1309 (M.D. Fla. 2018) (granting defendant's motion for summary judgment in TCPA case on the ground that equipment in question required human intervention to trigger initiation of calls and noting that the D.C. Circuit's holding in *ACA International* "set aside" the FCC's 2015 Order but "left intact earlier FCC rulings that 'the 'basic function' of an autodialer is to dial numbers without human intervention.'").

These court rulings, issued in the few months since *ACA International* was decided, demonstrate the risk of disparate interpretations of the TCPA in the absence of clear guidance from the FCC. Some courts have held that *ACA International* rejected the prior FCC orders and that random or sequential number generation is thus a requirement, others have ruled that *ACA International* left the prior FCC orders intact, meaning predictive dialers, which did not necessarily randomly or sequentially dial numbers, are autodialers, and still other courts have found the prior FCC orders void, but that systems are not required to randomly or sequentially

15

dial numbers to be considered an ATDS.  Compounding this confusion is the issue of human intervention and courts' varying standards for what level of human intervention is required to take a system out of the ATDS definition.  Now that the FCC is about to act, a stay is appropriate under the primary jurisdiction doctrine to provide this Court with clarity and to avoid adding to the confusion.

## III.     AUTHORITY AND ARGUMENT

### A.      The Court Has the Inherent Power to Issue a Stay.

"'[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'"  *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 96 (2d Cir. 2012) (alteration in original) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). Accordingly, a trial "'court has broad discretion to stay proceedings as an incident to its power to control its own docket.'"  *See Limonium Mar., S.A. v. Mizushima Marinera, S.A.*, 201 F.3d 431 (2d Cir. 1999) (quoting *Clinton v. Jones*, 520 U.S. 681, 706 (1997)); *see also Ford Motor Credit Co. v. Chiorazzo*, 529 F. Supp. 2d 535, 541-42 (D.N.J. 2008) (citing *Landis*, 299 U.S. at 254 (holding that a trial court has broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere)).  In determining whether to issue a stay, courts generally consider the interests of the plaintiff(s) in proceeding expeditiously against the prejudice to defendants if delayed; the interests of and burdens on the defendant(s); the interests of the court; the interests of non-parties; and the public interest.  *Reynolds*, 2017 WL 362025, at *2.  The specific factors relevant to whether a stay should issue under the primary jurisdiction doctrine are set forth below.

**B.      A Stay is Warranted Under the Primary Jurisdiction Doctrine.**

The primary jurisdiction doctrine "allows a federal court to refer a matter extending beyond the conventional experiences of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience, expertise, and insight." *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995).   It applies "whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body," *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996).

The doctrine "is concerned with 'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'"   *Ellis v. Tribune Television Co.*, 443 F.3d 71, 81 (2d Cir. 2006) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)).   "The rationale behind the doctrine includes a concern for maintaining uniformity in the regulation of an area entrusted to a federal agency, as well as a desire for utilizing administrative expertise," *id.* at 82 (internal citations omitted), and it "'seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within the regulatory regime.'"   *Id.* (quoting *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673 (2003)).   Accordingly, courts invoke the primary jurisdiction doctrine "to advance regulatory uniformity," "to answer a question . . . within the agency's discretion," and "to benefit from technical or policy considerations within the agency's . . . expertise."   *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010) (internal quotations omitted).

While "'[n]o fixed formula exists for applying the doctrine of primary jurisdiction,'" *Ellis*, 443. F.3d at 82 (quoting *W. Pac. R.R.*, 352 U.S. at 64), the Second Circuit has identified four factors that are considered in determining whether to apply primary jurisdiction:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

*Id.* at 82-83 (citing to *Nat'l Commc'ns Ass'n*, 46 F.3d at 222).  Application of these factors to the instant case counsel squarely in favor of a stay.

### 1.  The Determination of What Types of Systems Constitute Autodialers Requires the FCC's Expertise.

The first primary jurisdiction factor focuses on whether a court can benefit from technical or policy considerations within the agency's expertise.  This factor is unquestionably satisfied. *See, e.g.*, *Conboy v. AT & T Corp.*, 84 F. Supp. 2d 492, 502 (S.D.N.Y. 2000) ("[T]he courts do not possess the same expertise as the FCC in telecommunications matters."); *see also Wahl*, 2014 WL 4678043, at *2 (granting stay where pending FCC ruling would "offer insight into the complexity of the technical and policy issues, the resolution of which is outside the conventional experience of this Court"); *Stewart v. T-Mobile USA, Inc.*, No. 4:14-CV-02086-PMD, 2014 WL 12614418, at *3-4 (D.S.C. Oct. 8, 2014) ("It is virtually without dispute that the FCC has comparative expertise with regard to the TCPA.").  Invoking that expertise is particularly appropriate here, where there is substantial confusion and disagreement over the technical elements of an autodialer under the TCPA.

As discussed above, the FCC's Request for Comment makes plain that it intends to rule on issues related to the ATDS definition that are at issue in the present case.  Orangetheory contends no ATDS was used to send the text messages.  Plaintiff, however, will surely contest this position.  Although the weight of relevant case law supports a narrow ATDS definition in

light of *ACA International*, the FCC's forthcoming guidance will speak squarely to issues that are key to resolving this dispute. For example, in its Request for Comment, the FCC asked, "How 'automatic' must dialing be for equipment to qualify as an automatic telephone dialing system? Does the word 'automatic' envision non-manual dialing of telephone numbers? Must such a system dial numbers without human intervention?" Request for Comment at 2. Regarding the requirement that an ATDS must "produce telephone numbers to be called, using a random or sequential number generator," the FCC asked: "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?" *Id.* at 2-3. These fundamental questions regarding what constitutes an autodialer will, without a doubt, be contested issues in this litigation, and the FCC's ruling will be essential in adjudicating Plaintiff's claims.

**2.      The Relevant Issues the FCC's Request for Comment Raises Were Placed Squarely within the FCC's Jurisdiction to Administer and Interpret the TCPA.**

There is no debate regarding the FCC's authority to determine the definition of an autodialer. The FCC "was created in order to centralize authority with respect to telecommunications and other forms of interstate wire and radio communications," *Conboy*, 84 F. Supp. 2d at 501 (citing to 47 U.S.C. § 151) and it is "primarily responsible for the interpretation and implementation of the Telecommunications Act and FCC regulations." *Id.*; *see also* 47 U.S.C. § 151 (FCC has the authority to "execute and enforce the provisions of" the Telecommunications Act). Moreover, under the Hobbs Act, this Court might be bound by the

FCC's orders or at least required to give those orders deference.[13]   The second primary jurisdiction factor is satisfied and counsels in favor of a stay.

### 3.   There is a Substantial Danger of Inconsistent Rulings if a Stay is Not Issued.

The third factor to be considered is whether there is a substantial danger of inconsistent rulings.   If this case proceeds, there is a risk that the Court could reach a determination that is inconsistent with the FCC's ultimate decision on the definition of an autodialer.   Since *ACA International*, and in the absence of FCC guidance, courts have issued inconsistent rulings. Giving time for the FCC to decide how the system at issue in this case is to be treated under the statute will ensure even application of the TCPA.   *See Passero*, 2014 WL 2257185, at *2 ("With regard to the danger of inconsistent rulings, the court need look no further than the split of case law authority on the threshold issue as to whether the protective provisions of the TCPA even apply to debt collection calls."); *Wahl*, 2014 WL 4678043, at *2 ("[T]he substantial danger of inconsistent rulings is at hand based upon the number of cases cited . . . which have arrived at different conclusions.").   Moreover, the FCC has regulatory authority that subjects the "industry

---

[13] *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014).   Indeed, the Hobbs Act's procedural scheme is specifically designed to create uniform interpretation of technical issues requiring agency expertise.   Section 402(a) of the Communications Act provides that (except in limited circumstances not relevant here) any "proceeding to enjoin, set aside, annul, or suspend any order of the Commission" must be brought under the Hobbs Act.   47 U.S.C. § 402(a).   The Hobbs Act, in turn, expressly confers on the federal courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" such FCC orders.   28 U.S.C. § 2342.   This "procedural path designed by Congress serves a number of valid goals: it promotes judicial efficiency, vests an appellate panel rather than a single district judge with the power of agency review, and allows 'uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress' to enforce the TCPA."   *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010) (quoting *United States v. Dunifer*, 219 F.3d 1004, 1008 (9th Cir. 2000)).   On November 13, 2018, the Supreme Court granted certiorari in a TCPA case to determine the scope of judicial deference to the FCC rules under the Hobbs Act.   *See Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 469 (4th Cir. 2018).

to a comprehensive regulatory scheme that requires expertise or uniformity in administration." *Gusman v. Comcast Corp.*, No. 13CV1049-GPC DHB, 2014 WL 2115472, at *3 (S.D. Cal. May 21, 2014). This factor is satisfied and weighs in favor of a stay.

Furthermore, the parties and the Court will be subject to a significant burden if discovery in this case proceeds before the FCC issues its guidance. The parties will be forced to conduct discovery without a clear understanding of the definition of an autodialer—a definition that is key to resolution of the claims in this litigation. Courts facing similar circumstances have found the burden and expense of conducting blind discovery sufficient to justify a stay. *See*, *e.g.*, *Mejia*, 2017 WL 5513638, at *5 ("Without a stay, broad class-wide discovery may proceed based on an interpretation of 'ATDS' that might be modified or narrowed as a result of *ACA International*."); *Reynolds*, 2017 WL 362025, at *2 ("[T]he scope of the issues in dispute and the discovery relating thereto may be narrowed by the *ACA International* decision—an outcome that would save the parties from needless expenditures and promote judicial economy."); *Errington v. Time Warner Cable Inc.*, No. 2:15-CV-02196 RSWL (DTB), 2016 WL 2930696, at *4 (C.D. Cal. May 18, 2016) (granting stay pending D.C. Circuit's ruling in *ACA International*, finding "Defendant may suffer hardship in conducting discovery and trial preparation in light of the uncertain difference between 'potential' capacity and 'theoretical' capacity under the definition of an ATDS"); *see also Rose v. Wells Fargo Advisors, LLC*, No. 1:16-CV-562-CAP, 2016 WL 3369283, at *2 (N.D. Ga. June 14, 2016) (same). This factor is satisfied and weighs in favor of a stay.

### 4.     A Prior Application Has Been Made to the FCC.

The final factor to be considered is whether a prior application to the agency has been made. Here, the FCC issued its Request for Comment shortly after the decision in *ACA*

*International* and remains actively engaged in its effort to clarify the definition of an autodialer. As set forth more fully below, the FCC acted swiftly in issuing the Request for Comment, indicating its intention to issue its ruling promptly. Accordingly, the final factor is satisfied here and weighs in favor of a stay.

### C.   Courts Have Rejected All of the Reasons Plaintiff Might Raise in Objection to a Stay.

After analyzing and applying the primary jurisdiction doctrine, courts in other jurisdictions have issued stays under similar circumstances, and in doing so, have rejected the arguments that Plaintiff will likely raise against a stay in this case.

First, courts have rejected the argument that a stay would be futile because any action taken by the FCC would not have retroactive effect. *See Scoma Chiropractic, P.A. v. Dental Equities, LLC*, No. 16-cv-41-FtM-99MRM, 2018 WL 2455301, at *4 (M.D. Fla. June 1, 2018). In *Scoma*, the court held that this argument was "premature and does not affect this Court's analysis as to whether a stay is appropriate now. Whether the FCC's decision has retroactive or prospective effect depends on whether the FCC's decision is rulemaking or a clarification (or both), with a lens towards manifest injustice." *Id.* (citing *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 535-39 (D.C. Cir. 2007)).

Second, courts have found that while plaintiffs in TCPA cases have an interest in pursuing statutory damages, they "will not be significantly prejudiced by awaiting a decision [from another court or the FCC] to do so." *Reynolds*, 2017 WL 362025, at *2. This is particularly true where the challenged conduct has ceased. *See id.* The same calculus applies here. Plaintiff alleges she received one or more text messages in May and June of 2018 and does not assert the practice has continued. A modest delay to allow the FCC to provide clarity on this dispositive issue stands only to push out the time when plaintiff may potentially recover

22

monetarily.  On the other side of the ledger, Orangetheory is facing substantial liability based on the TCPA's onerous $500 or $1,500-per-text statutory damages clause.  *See* 47 U.S.C. § 227(b)(3).  This substantial liability, however, rests on Plaintiff establishing that Orangetheory used an autodialer.  On balance, the relative prejudices the parties may suffer weigh strongly in favor of a stay.

Third, courts have issued stays despite the indefinite nature of awaiting an FCC ruling, particularly where there is some indication from the FCC that a ruling will be forthcoming promptly.  *See, e.g.*, *Wahl*, 2014 WL 4678043, at *2; *Passero*, 2014 WL 2257185, at *3.

Likewise here, the FCC's rapid issuance of its Request for Comment following *ACA International* indicates the FCC will likely act quickly, though the FCC's action has apparently been delayed by the recent government shutdown.  Given that the composition of the FCC has changed since the 2015 Order, it is exceedingly likely that the FCC will narrow and clarify the definition of an autodialer.  Chairman Pai and Commissioner O'Reilly dissented vehemently to the 2015 Order that was overturned in *ACA International*, and the D.C. Circuit favorably cited their dissents in its decision.  *ACA Int'l*, 885 F.3d at 697, 702, 704.  Those dissenting statements (and other official statements issued by Chairman Pai and Commissioner O'Reilly) evidence an approach to the TCPA that is disapproving of broad interpretations.  *See, e.g.*, 2015 Order, at 8074 (Comm'r Pai dissenting) (noting that the 2015 Order "dramatically expands the TCPA's reach," is "flatly inconsistent with the TCPA"); *see also, id.* at 8087 (Comm'r O'Reilly dissenting) (calling the 2015 Order "unfathomable" in how it "further expands the scope of the TCPA").  Chairman Pai and Commissioner O'Reilly also issued statements following *ACA International* expressing their approval of the relevant portions of that decision.  Commissioner Carr, who became a Commissioner in August of 2017 and was formerly a legal advisor to

Chairman Pai, also issued a statement approving of the decision in *ACA International*, stating that "the prior FCC exceeded the scope of the TCPA and reached a decision of eye-popping sweep . . . "[14]  Given the views of the current leadership of the FCC, and the Commission's rapid action in setting a notice and comment period so soon after *ACA International*, the Commission will almost surely act quickly to clarify the definition of an autodialer and narrow the definition to more closely align with the statute's plain language.

Not only is the FCC's ruling likely to come soon, it will offer substantial guidance on the "complexity of the technical and policy issues" at play in determining the scope of the TCPA, thereby streamlining this case and preventing inconsistent rulings.  *See Wahl*, 2014 WL 4678043, at *2.  If this case is to proceed, the Court and the parties must grapple with the current, unclear, ATDS definition—an exercise that will surely require significant resources.  These significant resources will be totally wasted as soon as the FCC issues its ruling and clarifies the ATDS definition, which is likely why other courts have issued stays until the FCC clarifies the ATDS definition.  Accordingly, a modest delay is in the interest of both parties and the Court.

## IV.   CONCLUSION

For all the foregoing reasons, Orangetheory respectfully requests that a stay be granted pending the FCC's clarification of the ATDS definition.[15]

---

[14] *Statement of Commissioner Brendan Carr on D.C. Circuit Decision in* ACA International v. FCC, March 16, 2018, https://docs.fcc.gov/public/attachments/DOC-349769A1.pdf  (internal quotations omitted).

[15] Even though Plaintiff will suffer no harm from Orangetheory's requested temporary stay, if the Court is concerned about an indefinite stay, Orangetheory suggests that the Court order the parties to submit a status report to the Court in six months in the event the FCC has not ruled by that time, which will allow the Court to revisit the issue of a stay.

Dated: April 5, 2019                                  **DLA PIPER LLP (US)**
       Los Angeles, California


    _/s/ *Edward D. Totino*_
    Edward D. Totino
    550 South Hope Street Suite 2400
    Los Angeles, California 90071-2618
    Tel.: (213) 330-7700
    Fax: (213) 330-7701
    edward.totino@dlapiper.com

    Cary B. Samowitz
    Cassandra Beckman Widay
    Rachael C. Kessler (admitted *pro hac vice*)
    1251 Avenue of The Americas
    New York, NY 10020
    Tel.: (212) 335-4500
    Fax: (212) 335-4501
    cary.samowitz@dlapiper.com
    cassandra.beckmanwiday@dlapiper.com
    rachael.kessler@dlapiper.com

    *Attorneys for Defendant Ultimate Fitness*
    *Group, LLC d/b/a Orangetheory Fitness*

25